# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP157 |
| COMPLETE TITLE: | Dennis D. Dufour,<br>      Plaintiff-Appellant-Cross-Respondent,<br>    v.<br>Progressive Classic Insurance Company and<br>Milwaukee Painters Local Union 781 Health Fund,<br>      Defendants,<br>Dairyland Insurance Company,<br>      Defendant-Respondent-Cross-Appellant-<br>Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 364 Wis. 2d 757, 869 N.W.2d 169)
(Ct. App. 2015 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 6, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 5, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dodge |
| JUDGE: | Brian A. Pfitzinger |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| CONCURRED/DISSENTED: | ABRAHAMSON, J. and BRADLEY, A. W., J. concur |
| DISSENTED: | and dissent (Opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-respondent-cross-appellant-petitioner, there were briefs by *Robert F. Johnson*, *Douglas M. Raines,* and *von Briesen & Roper, S.C.*, Milwaukee and oral argument by *Douglas M. Raines*.

For the plaintiff-appellant-cross-respondent, there was a brief by *Jason F. Abraham*, *Kyra K. Plier,* and *Hupy and Abraham, S.C.*, Milwaukee. Oral argument by *Jason F. Abraham*.

There was an amicus curiae brief by *Jesse B. Blocher* and *Habush Habush & Rottier S.C.*, Waukesha, on behalf of the Wisconsin Association for Justice. Oral argument by *Jesse B. Blocher*.

There was an amicus curiae brief by *James A. Friedman*, *Dustin B. Brown* and *Godfrey & Kahn, S.C.*, Madison on behalf of the Wisconsin Insurance Alliace and the Property Casualty Insurers Association of American. Oral argument by *James A. Friedman.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP157
(L.C. No. 2011CV874)

STATE OF WISCONSIN    :    IN SUPREME COURT

**Dennis D. Dufour,**

    **Plaintiff-Appellant-Cross-Respondent,**

    **v.**

**Progressive Classic Insurance Company and Milwaukee Painters Local Union 781 Health Fund,**

    **Defendants,**

**Dairyland Insurance Company,**

    **Defendant-Respondent-Cross-Appellant-Petitioner.**

**FILED**

**JUL 6, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. We review an unpublished decision of the court of appeals,[1] affirming in part and reversing in part the summary judgment granted by Dodge County Circuit Court relative to injuries Dennis D. Dufour

---

[1] Dufour v. Progressive Classic Ins. Co., No. 2014AP157, unpublished slip op. (Wis. Ct. App. July 16, 2015).

(Dufour) suffered in an accident for which Dufour was not at fault.[2]

¶2   Dufour, the insured of Dairyland Insurance Company (Dairyland), sustained bodily injury and property damage while operating his motorcycle.  The tortfeasor's insurer paid Dufour its bodily injury policy limit of $100,000, and Dairyland paid Dufour $100,000 as its underinsured bodily injury policy limit.  The parties agree that Dufour's bodily injury damages were in excess of $200,000.  Under another provision of Dairyland's policy, it also paid Dufour $15,589.86 for 100% of the property damage to his motorcycle.  After paying Dufour all proceeds to which he was entitled under the Dairyland policy, and after Dufour had settled with the tortfeasor's insurer, Dairyland sought and obtained subrogation from the tortfeasor's insurer for the property damages that it previously paid to Dufour.  Dufour demanded Dairyland pay him the funds it obtained on its subrogation claim, and Dairyland refused.  Dufour then sued Dairyland for breach of contract and bad faith.

¶3   The central issue before us is whether Dairyland is entitled to retain funds it obtained from the tortfeasor's insurer for property damages Dairyland paid Dufour because Dufour's bodily injury damages exceed both policies' limits for bodily injury.  More specifically, we must determine whether the made whole doctrine applies to preclude Dairyland from retaining

---

[2] The Honorable Brian A. Pfitzinger of Dodge County presided.

2

its subrogation award in this instance. We also consider whether Dairyland acted in bad faith by refusing to turn over to Dufour the funds it obtained as a result of its subrogation claim.

¶4 We conclude that the made whole doctrine does not apply to preclude Dairyland from retaining the funds it received from its subrogation claim because the equities favor Dairyland: (1) Dairyland fully paid Dufour all he bargained for under his Dairyland policy, which included the policy's limits for bodily injury and 100% of Dufour's property damage; (2) Dufour had priority in settling with the tortfeasor's insurer; and (3) if Dairyland had not proceeded on its subrogation claim, Dufour would have had no access to additional funds from the tortfeasor's insurer. We further conclude that Dairyland did not act in bad faith with respect to Dufour's demand for the funds Dairyland obtained as subrogation for the property damages it paid Dufour. Accordingly, we reverse the court of appeals decision in all respects.

I. BACKGROUND

¶5 On August 6, 2011, Dufour sustained bodily injury and property damage in a motorcycle accident for which an underinsured motorist was at fault. Dufour's Dairyland policy included a bodily injury limit of $100,000 for underinsured motorists and a separate property damage limit of $40,000. American Standard Insurance Company of Wisconsin (American Standard) insured the tortfeasor, with a bodily injury limit of $100,000.

¶6 As a result of the accident, Dairyland paid Dufour $100,000 as its underinsured motorist bodily injury policy limit. American Standard also paid Dufour $100,000 pursuant to its bodily injury policy limit. It is undisputed that Dufour's bodily injuries arising out of the accident were in excess of $200,000. In addition to bodily injury proceeds, Dairyland paid Dufour $15,589.86, which was agreed upon as the full amount of property damage Dufour sustained.[3]

¶7 After Dairyland and American Standard paid Dufour, Dairyland sought subrogation from American Standard for the property damages it paid to Dufour. Dufour's Dairyland policy included a subrogation clause that provided, "[a]fter we have made payment under this policy and, where allowed by law, we have the right to recover the payment from anyone who may be held responsible." American Standard paid Dairyland $15,559.86 on this subrogation claim.[4]

¶8 Dufour contacted Dairyland, requesting payment of the funds it received on its subrogation claim, based on Wisconsin's made whole doctrine. His request stated in relevant part:

> Dennis Dufour[] is entitled to the full amount recovered for property damage by Dairyland Insurance from American [Standard]. Valley Forge Insurance Co.

---

[3] Some portions of the record indicate that the settlement was in the amount of $15,589.85.

[4] The record is unclear as to why Dairyland received $30 less than the property damage amount that it paid to Dufour. Both parties acknowledge this discrepancy, and it is unimportant to our decision.

4

v. Home Mutual Insurance Co., 133 Wis. 2d 364, 396 N.W.2d 348 ([Ct. App.] 1986) held that an insurer of an automobile accident victim was not entitled to subrogation for property damage paid to victim, when the insured is not fully compensated for his damages. This ruling follows longstanding law in Wisconsin regarding subrogation, see Garrity v. Rural Mutual Insurance Co., 77 Wis. 2d 537, 253 N.W.2d 512 (1977) and Rimes v. State Farm Mutual Automobile Insurance Co., 106 Wis. 2d 263, 316 N.W.2d 348 (1982). Subrogation is to be allowed only when the insured is compensated in full by recovery from the tortfeasor.

Dufour's December 2, 2011 letter to Dairyland. Dairyland responded to Dufour's request, disputing that he was entitled to further payments from Dairyland:

Mr. Dufour has been paid all limits to which he is entitled. Mr. Dufour has no right to Dairyland Insurance's claim for subrogation related to property damage. Accordingly, we are denying your claim.

Dairyland's March 13, 2012 letter to Dufour.

¶9 Based on Dairyland's refusal, Dufour amended his complaint, alleging that Dairyland breached its insurance contract and acted in bad faith by unreasonably failing to turn over the funds it received in subrogation. Relying on Valley Forge, the circuit court granted Dufour's motion for summary judgment with respect to turnover of the funds from Dairyland's subrogation claim. However, the circuit court agreed with Dairyland with respect to bad faith, concluding that Dairyland did not unreasonably withhold the funds.

¶10 Both parties appealed, and the court of appeals affirmed the circuit court's grant of Dufour's motion for summary judgment because it concluded that Dufour had not been made whole for his bodily injuries and, therefore, Dairyland was

not entitled to retain the funds it obtained as subrogation.[5] Further, the court of appeals held that Dairyland acted in bad faith in light of its obligations under the made whole doctrine and remanded for a determination of damages for Dufour's bad faith claim.[6]

¶11 We granted Dairyland's petition for review.

## II. DISCUSSION

### A. Standard of Review

¶12 We review grants of summary judgment independently, applying the same methodology as the circuit court and the court of appeals, while benefitting from their analyses. Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶16, 360 Wis. 2d 129, 857 N.W.2d 136. "The standards set forth in Wis. Stat. § 802.08 are our guides." Id. Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2) (2013-14).

¶13 Our review requires us to determine the applicability of the made whole doctrine to funds Dairyland recovered in subrogation from American Standard. This is a question of law

---

[5] Dufour, unpublished slip op., ¶26.

[6] Id., ¶36.

that we review independently. <u>Muller v. Society Ins.</u>, 2008 WI 50, ¶20, 309 Wis. 2d 410, 750 N.W.2d 1.

### B. Subrogation

¶14 Dairyland's insurance policy expressly provides: "[a]fter we have made payment under this policy and, where allowed by law, we have the right to recover the payment from anyone who may be held responsible." Accordingly, we determine whether, because Dufour was not made whole for his bodily injury, Dairyland is precluded by law from retaining funds American Standard paid to it as subrogation for the property damages Dairyland paid to Dufour. Prior to undertaking our discussion of the made whole doctrine's applicability to Dufour's claim, we first address the law of subrogation, generally.

### 1. General subrogation principles

¶15 Subrogation is the "substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." <u>Black's Law Dictionary</u> 1563-64 (9th ed. 2009). Contractual subrogation and equitable subrogation both exist under Wisconsin law.[7] <u>Jindra v. Diederich Flooring</u>, 181 Wis. 2d 579, 601, 511 N.W.2d 855 (1994). With either type of

---

[7] Contractual subrogation has been referred to as "conventional subrogation." <u>Jindra v. Diederich Flooring</u>, 181 Wis. 2d 579, 601, 511 N.W.2d 855 (1994). Equitable subrogation has been referred to as "common law subrogation." <u>Garrity v. Rural Mut. Ins. Co.</u>, 77 Wis. 2d 537, 541, 253 N.W.2d 512 (1977).

subrogation, equities affect the asserted right to subrogation when it is presented by an insurance company. Garrity v. Rural Mut. Ins. Co., 77 Wis. 2d 537, 540-41, 253 N.W.2d 512 (1977). Recently, we summarized subrogation in an insurance context where we applied equitable principles to a contractual right of subrogation:

> [S]ubrogation is a purely derivative right that permits an insurer who has been contractually obligated to satisfy a loss created by a third party to step into the shoes of its insured and to pursue recovery from the responsible wrongdoer. . . . The doctrine of subrogation enables an insurer that has paid an insured's loss pursuant to a policy of property insurance to recoup that payment from the party responsible for the loss.

Muller, 309 Wis. 2d 410, ¶22 (internal citations omitted).[8]

¶16 Subrogation avoids unjust enrichment because it precludes double payment for the same loss. Id., ¶29. Moreover, "[s]ubrogation rests upon the equitable principle that one, other than a volunteer, who pays for the wrong of another should be permitted to look to the wrongdoer to the extent he has paid and be subject to the defenses of the wrongdoer." Garrity, 77 Wis. 2d at 541. Therefore, subrogation balances equities between parties by precluding the insured from recovering twice for the same loss while compelling payment by

---

[8] Mullers' contract with Society contained a subrogation clause with language providing for recoupment of payment by Society. Muller v. Society Ins., 2008 WI 50, ¶71, 309 Wis. 2d 410, 750 N.W.2d 1.

8

the tortfeasor who caused the harm in the first instance. Muller, 309 Wis. 2d 410, ¶24.

¶17 Further, we repeatedly have emphasized the fact-specific and equitable nature of subrogation. See, e.g., id., ¶26 (recognizing that subrogation is "heavily influenced by particular facts"); Vogt v. Schroeder, 129 Wis. 2d 3, 12, 383 N.W.2d 876 (1986) (stating that "subrogation is an equitable doctrine and depends upon a just resolution of a dispute under a particular set of facts"); Rimes, 106 Wis. 2d at 271 (acknowledging that "subrogation is based upon equitable principles").

¶18 We have identified three non-exhaustive, equitable principles that may affect subrogation: "(1) ensuring that the plaintiff is fully compensated for loss; (2) preventing unjust enrichment; and (3) ensuring that the wrongdoer is held responsible for his conduct and not allowed to go scot-free by failing to respond to damages while another, the plaintiff's insurer, is required to do so." Muller, 309 Wis. 2d 410, ¶60 (citing Vogt, 129 Wis. 2d at 13). We now turn to discuss the made whole doctrine both generally and in some detail.

## 2.  Made whole doctrine

### a.  made whole, generally

¶19 Ensuring that the insured is fully compensated for his loss is the essence of the made whole doctrine. Namely, "equity provides that subrogation ordinarily does not arise until the underlying debt or loss has been paid in full. This 'antisubrogation rule' is known as the made whole doctrine."

Id., ¶25 (citations omitted). The made whole doctrine attempts to "[b]alanc[e] the insurer's right to recoup benefits it has paid against an insured's right to obtain full compensation." Id.

¶20 Our decisions demonstrate that the made whole doctrine is but one consideration in determining whether an insurer is entitled to subrogation. Vogt, 129 Wis. 2d at 13 (recognizing "distinct and separate equitable polic[ies]" in considering subrogation); Muller, 309 Wis. 2d 410, ¶60 ("[T]he made whole doctrine is not applicable in all situations, and thus the test of 'wholeness' stated in Rimes is not the sole criterion for determining whether an insurer may pursue its subrogation interest"). Stated otherwise, an insurer is not always precluded from retaining funds obtained as subrogation for payments the insurer previously made simply because the insured has not been fully compensated for the loss. Rather, the specific facts and equities dictate whether the made whole doctrine will apply to prevent an insurer from retaining funds received for its subrogation claim.

b. made whole, in detail

¶21 Because Garrity and Rimes are the foundation of the made whole doctrine, it is important to understand what they say and why, as well as to recognize the issues they did not address. The made whole doctrine embodies the principle that, "[o]rdinarily, subrogation does not arise until the debt [to the injured party] has been fully paid." Garrity, 77 Wis. 2d at 541. We explained in Garrity that the insurer "has no share in

10

the recovery from the tort-feasor if the total amount recovered by the insured from the insurer does not cover his loss." Id. at 544. In Rimes, we also said:

> The purpose of subrogation is to prevent a double recovery by the insured. Under circumstances where an insured has received full damages from the tortfeasor and has also been paid for a portion of those damages by the insurer, he receives double payment——he has been made more than whole. Only under those circumstances is the insurer, under principles of equity, entitled to subrogation.

Rimes, 106 Wis. 2d at 272.

¶22 Subsequent to our initial setting out of the made whole doctrine, we recognized that both Garrity and Rimes presented the same factual scenario where equity drove our conclusion that the made whole doctrine applied. We explained:

> The circumstances in each of those cases were substantially the same, and therefore the subrogation problem posed in each was subject to resolution by applying the same equitable principle to the facts—— that the insured had a right to be made whole, but no more than whole. Hence, the insurer was to be subrogated only if further recovery would do more than make the insured whole.

Vogt, 129 Wis. 2d at 13.

¶23 It is important to note that in both Garrity and Rimes, the insurer attempted to exercise its claim of subrogation against funds that otherwise would have gone to its insured. Id. at 14. Therefore, if the insurer had prevailed on its subrogation claim, the insured would not have been paid all that he had contracted to receive under his own policy. The issue in Garrity and Rimes may be summarized as one of priority:

11

there was a limited pool of funds available, and the issue was whether the insurer or the insured enjoyed priority to those funds for which they were competing. Id. at 14-15.

¶24 For example, in Garrity, the insureds' barn sustained damages due to a negligently operated truck, and the insureds sought proceeds under both their own policy and the tortfeasor's policy.[9] Garrity, 77 Wis. 2d at 539. The insureds recovered the policy limit under their own policy, $67,227.12; however, damages to the barn were in excess of $100,000. Id. Accordingly, the insureds also required proceeds under the tortfeasor's insurance policy, which had a policy limit of $25,000, as they attempted to cover their loss. Id. at 543.

¶25 The insurer asserted a subrogation claim against the tortfeasor's policy limit of $25,000 to recoup part of the $67,227.12 that it had paid to its insureds. Id. at 540-41. Consequently, permitting the insurer's subrogation claim would have reduced the insureds' recovery by $25,000, thereby increasing the amount by which the insureds were not made whole. See Vogt, 129 Wis. 2d at 14-15. In concluding that the insureds maintained priority to the tortfeasor's $25,000 policy limit for which the insurer was competing, we stated that, "where either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume." Garrity, 77 Wis. 2d at 542.

---

[9] Both the insured and the tortfeasor maintained insurance policies with the same insurance company.

¶26 Rimes involved an automobile accident where the insured sustained damages in excess of $300,000. Rimes, 106 Wis. 2d at 264-65. The insured received $9,649.90 from its insurer, State Farm Automobile Insurance Company, under medical-pay policy provisions in two State Farm policies, each with a $5,000 limit. Id. at 265-66. Subsequently, the insured stipulated to a $125,000 settlement with the tortfeasors' insurers, which amount included $9,649.90 for medical-pay. Rimes was paid all but $9,649.90, which amount was paid into court subject to State Farms' subrogation claim. Id. at 267.

¶27 The circuit court held a mini-trial on damages, finding Rimes' total damages were $300,433.54, of which past medical expenses were $26,560.70.[10] Id. at 268-69. In applying the made whole doctrine to preclude the insurer from accessing funds for which it was competing with its own insured, we stated that, "[u]nder Wisconsin law[,] the test of wholeness depends upon whether the insured has been completely compensated for all the elements of damages, not merely those damages for which the insurer has indemnified the insured." Id. at 275. In Rimes, the insured was not made whole for either medical-pay damages or for personal injury damages. Therefore, the insured was not required to disgorge amounts for which he was indemnified by his insurer. Id. at 276.

---

[10] This type of evidentiary hearing on damages has become known as a Rimes hearing or a made whole hearing. Schulte v. Frazin, 176 Wis. 2d 622, 627, 500 N.W.2d 305 (1993).

13

¶28 We subsequently clarified that the broad statements from Garrity and Rimes were to be applied only when the application of the made whole doctrine would yield an equitable result. Vogt, 129 Wis. 2d at 12. For example, in Vogt, the insured, who was the injured party in an automobile accident, suffered damages in excess of the tortfeasor's insurance policy's $15,000 limit of liability. Id. at 7. The tortfeasor's insurer offered to settle with the insured-injured party for its $15,000 policy limit in exchange for a release of the tortfeasor and the tortfeasor's insurer from any further liability. Id. at 8. Because the insured-injured party's damages exceeded the tortfeasor's $15,000 limit of liability, the insured also was entitled to recover under his own policy's $50,000 underinsured motorist coverage. Id. The insured-injured party's insurer refused to approve the settlement and release without preserving its right to subrogation, and the matter came before the circuit court for resolution. Id.

¶29 We explained in Vogt that our central inquiry was "[w]hether an automobile insurer which by the terms of its contract pays its own insured under the underinsured motorist coverage has a right of subrogation against the tortfeasor . . . once a payment has been made to its own insured." Id. at 15-16. In answering this question in the affirmative, we noted a "distinct and separate equitable [principle]" that is important when considering how the made whole doctrine is to function. Id. at 13. Specifically, we concluded that the tortfeasor

14

should be held "responsible for his conduct and not [] allowed to go scot-free by failing to respond in damages." Id.

¶30 Notably, the issue in Vogt was not the same as the issue of priority that was presented in Garrity and Rimes where subrogation would have operated to reduce the insured's recovery to which he was entitled under his own policy. See id. at 15. Rather, in Vogt, there was no competition, and the insured maintained priority to all proceeds to which he was entitled under the tortfeasor's policy limit, as well as under his own policy. Id. at 17-18. In such a situation, it would have been inequitable to allow the insured unilaterally to prevent his insurer from seeking subrogation from the tortfeasor, and thereby hold the tortfeasor accountable if subrogation would have no discernible effect on the insured's recovery. See id. at 17-19. Consequently, we declined to apply the made whole doctrine to prevent the insurer from seeking subrogation from the tortfeasor. Id. at 19.

¶31 In Mutual Service, we further explained the independent nature of subrogation claims and their connection to the made whole doctrine. We clarified that an insurer who pays a claim to its insured for which a tortfeasor is responsible has a derivative, but separate claim against the tortfeasor and the tortfeasor's insurer. "In such a situation, we have characterized the interests of the insurer and the insured as each owning separately a part of the claim against the tortfeasor." Mut. Serv. Cas. Co. v. Am. Family Ins. Grp., 140 Wis. 2d 555, 561, 410 N.W.2d 582 (1987).

15

¶32 In Mutual Service, we held that when an insurer maintains a separate subrogation claim against the tortfeasor, the made whole doctrine as articulated in Garrity and Rimes is inapplicable if the claim is "brought by a subrogated insurer against the tortfeasor or the tortfeasor's insurer where the subrogated insurer's insured has previously settled with the tortfeasor." Id. at 563-64. As with Vogt, we did not apply the made whole doctrine to preclude the insurer's claim for subrogation. See id. It is important to note that in the absence of the insurer's success on its subrogation claim, there would not have been any funds that the insured could seek to collect after having recovered under her own policy as well as under the settlement agreement with the tortfeasor. See id.; see also Vogt, 129 Wis. 2d at 17-19.

¶33 In Schulte v. Frazen, 176 Wis. 2d 622, 500 N.W.2d 305 (1993), a medical malpractice action, we examined a settlement that permitted Schulte, through an indemnification agreement among Schulte, the tortfeasor and the tortfeasor's insurer, to unilaterally defeat the insurer's subrogation claim against the tortfeasor and his insurer. Id. at 625. There, Schulte received $90,000 in medical payments from her insurer, Compcare Health Services Insurance Corporation. Id. at 625-26. Schulte then settled with the tortfeasor and the tortfeasor's insurer for $2,460,000. Id. at 626. As part of the settlement, Schulte agreed to indemnify the tortfeasor and the tortfeasor's insurer for any further liability they incurred from the medical malpractice. Id. at 626-27.

16

¶34 Schulte then moved to extinguish Compcare's subrogation lien and requested a <u>Rimes</u> hearing. <u>Id.</u> Because of the indemnification agreement, Compcare, who was not consulted prior to Schulte's settlement, found itself in competition with Schulte over the funds she had received. <u>Id.</u> at 633-34 ("[A]n indemnification agreement indirectly creates the prospect that the insurer will be competing with its own insured.").

¶35 At the <u>Rimes</u> hearing, the circuit court found that Schulte's damages were between $2,950,000 and $4,790,000 and therefore, Schulte had not been made whole by the settlement. <u>Id.</u> at 627. If Compcare prevailed on its subrogation claim that arose from the $90,000 it paid Schulte in medical-pay, Schulte would have been required to indemnify the tortfeasor for that amount. <u>See</u> <u>id.</u> Therefore, the recovery to which she was entitled under her own insurance policy would have been reduced by $90,000, for which coverage Schulte had paid a premium. <u>See</u> <u>id.</u> Consequently, we concluded that the circuit court correctly applied the made whole doctrine when it extinguished Compcare's subrogation claim due to the indemnification agreement. <u>Id.</u> at 633-35.

¶36 Most recently, we considered the applicability of the made whole doctrine in <u>Muller</u>, where the pool of money available was sufficient to fully satisfy the injured parties' losses and the subrogation claim of their insurer. The Mullers' property was destroyed by a fire, resulting in damages of $697,981.58. <u>Muller</u>, 309 Wis. 2d 410, ¶5. The Mullers' insurer, Society Insurance, paid them $407,378.88, Society's policy limit. This

17

payment left the Mullers uncompensated by $290,602.70. Id., ¶6. The tortfeasor was insured under a United Fire and Casualty policy with a liability limit of $1,000,000. Id., ¶5.

¶37 Although the tortfeasor's United policy was sufficient to cover the remaining loss, the insureds voluntarily settled with the tortfeasor for $120,000. Id., ¶11. The settlement agreement contained no indemnification obligation for the Mullers. Id., ¶12. Subsequently, Society and United settled Society's subrogation claim for $190,000. Id. The Mullers then argued that they were entitled to receive the remainder of their loss from those funds, as they had not yet been made whole. Id., ¶13.

¶38 We set forth the issue as follows:

> [W]hether an insurer may retain in full a subrogation settlement with a tortfeasor and a tortfeasor's insurer after its insureds have settled with the tortfeasor and the tortfeasor's insurer for an amount less than necessary to make the insureds "whole," even though the tortfeasor's insurance policy limits were sufficient to cover all claims, including those of both the insureds and the insurer.

Id., ¶2. Given the equities created by the facts of the case, we did not apply the made whole doctrine, which would have deprived the insurer of its subrogation rights. Instead, we held that Society had fulfilled all of its obligations under its insurance policy by paying the Mullers' policy limits, by not competing with the Mullers for a limited pool of funds and had done nothing to otherwise reduce the Mullers' recovery. Id., ¶4.

18

¶39 Additionally, we acknowledged that an insurer has a separate subrogation claim against the tortfeasor, which the insurer was entitled to pursue as long as it recognized the priority of the insureds to available funds, which Society did. Id., ¶72.

¶40 Even though the Mullers were not made whole,[11] they received all benefits under their own insurance policy for which they bargained and all benefits from their settlement agreement with the tortfeasor. Id., ¶70. Had Society chosen not to pursue its subrogation claim, the Mullers would not have had access to any additional monies after collecting under both their policy with Society and the settlement agreement with United. Id., ¶86. Therefore, we concluded that it would have been inequitable to allow the Mullers to prevent their insurer, Society, from retaining funds received on its subrogation claim and "would discourage subrogees from pursuing their subrogation rights." Id.

¶41 We now consider the court of appeals' Valley Forge decision, upon which both the circuit court and court of appeals relied when denying Dairyland's retention of funds it recovered in subrogation from the tortfeasor's insurer. There, the insured, Samuel McIlrath, was injured in an automobile accident and also sustained property damage to his vehicle. Valley Forge, 133 Wis. 2d at 366. McIlrath maintained a Valley Forge

---

[11] There was no Rimes hearing, but the parties agreed that Mullers were not made whole by the payments they received.

19

automobile insurance policy with collision coverage, under which Valley Forge paid approximately $6,000 for property damages. Id. at 366-67. The tortfeasor, Joseph E. Ropson, maintained an insurance policy with Home Mutual, which provided separate policy limits for bodily injury and property damage. Id. at 366.

¶42 Pursuant to the settlement agreement, Home Mutual paid McIlrath and two passengers who were injured its bodily injury policy limits, with McIlrath receiving $25,000. Id. Home Mutual also paid McIlrath $6,000 in property damage. Id. at 366-67. It was undisputed that McIlrath's bodily injury damages exceeded $25,000 and that he was paid twice for his property damage, once by Valley Forge and once by Home Mutual. Id. at 367, 369. Further, the property damage payment was made directly to McIlrath, rather than to Valley Forge, at the direction of McIlrath's attorney. The settlement agreement also required McIlrath to indemnify Home Mutual from any claims made against it or the tortfeasor by Valley Forge. Id. at 367. This placed Valley Forge's subrogation claim in direct competition with the recovery of its insured. See Schulte, 176 Wis. 2d at 633-34.

¶43 Valley Forge sued Home Mutual, its insured, Ropson, and McIlrath, asserting a subrogation claim based on its previous $6,000 property damage payment to McIlrath. The subrogation claim of Valley Forge against Home Mutual and Ropson, if successful, would have taken $6,000 from McIlrath due to McIlrath's indemnification obligation to Home Mutual and

20

Ropson under the settlement agreement. This would have caused McIlrath's first-party claim against Valley Forge to become unfunded.[12]

¶44 Rejecting the insurer's claim to recoup the subrogated property damage funds from its own insured through the operation of the indemnification provision in the settlement agreement, the court of appeals over simplified the issue as whether the insurer or the insured should go unpaid, and concluded that "the loss should be borne by the insurer for that is a risk the insured has paid it to assume." Valley Forge, 133 Wis. 2d at 369-70 (quoting Garrity, 77 Wis. 2d at 542). In so doing, the court of appeals overlooked the equities affecting Valley Forge and whether McIlrath was entitled to pursue subrogated property damage funds from Home Mutual in the first instance because he had been fully paid for that claim by Valley Forge.[13]

---

[12] A first-party claim in an insurance context is a claim made by the insured on his contract of insurance with his insurer, as distinguished from the situation in which a third party sues an insurer. Brethorst v. Allstate Prop. & Cas. Ins. Co., 2011 WI 41, ¶¶23-24, 334 Wis. 2d 23, 798 N.W.2d 467.

[13] As we have explained, one cause of action may arise out of an automobile accident, but it can contain two claims: one for property damage and one for personal injury. Borde v. Hake, 44 Wis. 2d 22, 29, 170 N.W.2d 768 (1969). Subsequent to the insurer's payment of the insured's property damage, the insurer and its insured have common ownership of that claim. Id. at 28; see also Heifetz v. Johnson, 61 Wis. 2d 111, 122, 211 N.W.2d 834 (1973) (withdrawing dicta from Borde relative to statute of limitations effect of failing to name subrogated insurer).

21

¶45 Moreover, the court of appeals missed the import of the indemnity provision in the settlement agreement to the equities that related to the insurer, even though in Vogt we pointed out similar equitable issues to that which an indemnity agreement can raise. Instead of paying heed to what we had said about the equities that affect subrogation, the court of appeals dismissed our decision in Vogt as "inapposite" to the issues presented in Valley Forge. Id. at 369.

¶46 By so doing, the court of appeals failed to consider the equitable bases upon which we refused to enforce full releases of the tortfeasor and his insurer required by the settlement offer in Vogt and how those equities would have been implicated as the court of appeals considered the indemnity provision of the settlement agreement in Valley Forge. As we carefully explained in Vogt, when the insured has received payment under his own policy and an opportunity to settle with the tortfeasor and the tortfeasor's insurer, "a just result" puts the ultimate burden on the tortfeasor, not on the insurer who has paid a first-party claim in full under its contract with its insured. Vogt, 129 Wis. 2d at 19.

¶47 More specifically, in Vogt, we examined contentions that related to a settlement agreement that required full releases of the tortfeasor and his insurer by the injured party: (1) payment to the injured party of $15,000, the tortfeasor's policy limits; (2) release of the tortfeasor from any obligation for damages he caused; and (3) termination of the insurer's subrogation rights. Id. at 8. After balancing the equities

22

among the parties, we did not terminate the insurer's subrogation claim. Rather, we offered the insurer the choice of paying its insured's first-party claim from the $50,000 of underinsured motorist coverage[14] and then pursuing the tortfeasor for payment in subrogation or paying its insured's first-party claim and accepting the settlement if the insurer determined that the tortfeasor was not collectable and, therefore, not worth pursuing. Id. at 26.

¶48 Given the record before us, we were unsure whether the tortfeasor was collectable; therefore, we remanded the matter to the circuit court to give the insurer sufficient time to decide how it would proceed. Id. Importantly, the balance we effected did not put the insurer in competition with its own insured and permitted the insurer to hold the tortfeasor responsible for the damages he had caused.

### 3. Application: made whole or subrogation

¶49 We conclude that, given the facts presented in the instant case, the made whole doctrine does not apply to preclude Dairyland from retaining funds obtained in subrogation even though Dufour has not recovered all of his bodily injury damages flowing from the accident. First, Dairyland fully paid Dufour its bodily injury policy limit of $100,000 as well as 100% of the damage to his motorcycle under its property damage

---

[14] "There is nothing in the record to show the total amount of damages to which Vogt may be entitled." Vogt v. Schroeder, 129 Wis. 2d 3, 7, 383 N.W.2d 876 (1986).

provision. As with Muller, these proceeds constituted every dollar to which Dufour was entitled under his contract of insurance with Dairyland. See Muller, 309 Wis. 2d 410, ¶70. Had Dufour wished to insure himself against greater bodily injury losses, he could have paid a higher premium for higher policy limits.

¶50 Second, Dufour also had priority in recovering from the tortfeasor's policy, as required by Garrity, wherein he was paid the policy limit of $100,000 for bodily injury. Garrity, 77 Wis. 2d at 542-43. Dairyland permitted Dufour to recover all benefits to which he was entitled under both policies before it pursued its separate subrogation claim against the tortfeasor's insurer. Third, by waiting until Dufour recovered all available proceeds under both insurance policies, Dairyland was not in competition with Dufour for a limited pool of funds. As Dufour acknowledges, but for Dairyland's subrogation action against the tortfeasor's insurer, Dufour would have no access to any additional funds from either insurer. Consequently, allowing Dairyland to seek and obtain subrogation had no effect on Dufour's recovery. Muller, 309 Wis. 2d 410, ¶4.

¶51 Therefore, the equities presented favor Dairyland, which has wholly fulfilled its contractual obligations to Dufour. Dufour purchased two types of insurance coverage that are relevant here: bodily injury and property damage. Each coverage type gave rise to a separate premium, a separate policy limit and a separate description of the kind of damage for which it would indemnify Dufour. He exhausted his underinsured

24

motorist bodily injury policy limit and now is attempting to tap into his property damage policy limit in order to satisfy his remaining bodily injury losses. We decline to rewrite Dairyland's policy to provide for lump sum coverage where such coverage was not contemplated by the parties. Brethorst v. Allstate Prop. & Cas. Ins. Co., 2011 WI 41, ¶68, 334 Wis. 2d 23, 798 N.W.2d 467 (declining to rewrite insurance policy "to bind an insurer to a risk which it did not contemplate and for which it was not paid"); Maxwell v. Hartford Union High Sch. Dist., 2012 WI 58, ¶¶34-35, 341 Wis. 2d 238, 814 N.W.2d 484 (emphasizing importance of both insurers and insureds receiving the benefit of their bargain as premiums are based on risk assessment). Although we are sympathetic to Dufour's personal injuries for which he was not made whole, preventing an insurer from pursuing its subrogation claim for property damage payments under circumstances such as presented herein would not solve the problem of underinsurance for personal injuries.[15]

¶52 Finally, although we have serious concerns about the court of appeals decision in Valley Forge and caution against its use, given our discussions in Vogt, subsequent cases and herein, we do not overrule Valley Forge. The holding in Valley Forge requires a settlement agreement whereby the injured party becomes obligated to indemnify the tortfeasor and its insurer

---

[15] Insurers would not proceed on their subrogation claims were they not able to retain the funds awarded from those claims.

for any award the injured party's insurer obtains in subrogation. Such an agreement sets up the potential for competition for a limited pool of funds between the insurer and its insured. Schulte, 176 Wis. 2d at 633-34. There is no indemnification agreement here, no potential competition for a limited pool of funds and no potential to apply Valley Forge.

### C. Bad Faith

¶53 A bad faith claim is a separate and distinct cause of action from an insured claiming that the insurer breached its insurance contract. Brethorst, 334 Wis. 2d 23, ¶23. Bad faith sounds in tort, not in contract, and it constitutes "a separate intentional wrong, which results from a breach of duty imposed as a consequence of the relationship established by contract." Anderson v. Cont'l Ins. Co., 85 Wis. 2d 675, 687, 271 N.W.2d 368 (1978).

¶54 In order to prevail on a bad faith claim, an insured must establish three elements. Brethorst, 334 Wis. 2d 23, ¶¶49, 65 (citing Weiss v. United Fire & Cas. Co., 197 Wis. 2d 365, 377, 541 N.W.2d 753 (1995) and Benke v. Mukwonago-Vernon Mut. Ins. Co., 110 Wis. 2d 356, 362, 329 N.W.2d 243 (Ct. App. 1982)). The insured must show all of the following: First, "that there is no reasonable basis for the insurer to deny the insured's claim for benefits under the policy." Id. Second, "that the insurer knew of or recklessly disregarded the lack of a reasonable basis to deny the claim." Id. Third, "some breach of contract by an insurer is a fundamental prerequisite for a

first-party bad faith claim against the insurer by the insured."
Id., ¶65.

¶55 As we have explained above, Dairyland paid Dufour every dollar to which he was entitled under its policy. Therefore, Dairyland did not breach its insurance contract. That Dairyland sought and obtained subrogation for payments it made to Dufour is not in contravention of the parties' contract. Quite to the contrary, Dairyland's policy specifically provided, "[a]fter we have made payment under this policy and, where allowed by law, we have the right to recover the payment from anyone who may be held responsible." As insurer of the tortfeasor, American Standard was a person who may be held responsible for the tortfeasor's negligence and it was from American Standard that Dairyland obtained subrogation. Accordingly, we conclude that Dairyland did not act in bad faith by retaining the funds it obtained as subrogation.

### III.  CONCLUSION

¶56 We conclude that the made whole doctrine does not apply to preclude Dairyland from retaining the funds it received from its subrogation claim because the equities favor Dairyland: (1) Dairyland fully paid Dufour all he bargained for under his Dairyland policy, which included the policy's limits for bodily injury and 100% of Dufour's property damage; (2) Dufour had priority in settling with the tortfeasor's insurer; and (3) if Dairyland had not proceeded on its subrogation claim, Dufour would have had no access to additional funds from the tortfeasor's insurer. We further conclude that Dairyland did

27

not act in bad faith with respect to Dufour's demand for the funds Dairyland obtained as subrogation for the property damages it paid Dufour. Accordingly, we reverse the court of appeals decision in all respects.

*By the Court.*—The decision of the court of appeals is reversed.

¶57 SHIRLEY S. ABRAHAMSON, J. *(concurring in part and dissenting in part).* The instant case focuses on the interplay of subrogation and the made whole doctrine. Subrogation enables an insurance company that has paid its insured's loss pursuant to its policy to recoup that payment from the party responsible for the loss.[1] The made whole doctrine limits an insurance company's rights to subrogation in recognition of the injured insured's right to obtain full compensation for his or her losses.

¶58 A tension exists between the two doctrines.

¶59 The made whole doctrine is an equitable limitation on subrogation. Indeed, the court has called the made whole doctrine "an antisubrogation rule."[2] The made whole doctrine, simply and generally stated, is "that there is no subrogation until the insured has been made whole,"[3] that is, an insurer may

---

[1] Muller v. Society Ins., 2008 WI 50, ¶22, 309 Wis. 2d 410, 750 N.W.2d 1; see also Garrity v. Rural Mut. Ins. Co., 77 Wis. 2d 537, 541, 253 N.W.2d 512 (1977) ("Subrogation rests upon the equitable principle that one, other than a volunteer, who pays for the wrong of another should be permitted to look to the wrongdoer to the extent he has paid and be subject to the defenses of the wrongdoer.") (citations omitted).

The subrogation provision in Dairyland's policy states: "After we have made payment under this policy and, where allowed by law, we have the right to recover the payment from anyone who may be held responsible." Majority op., ¶7.

[2] Muller, 309 Wis. 2d 410, ¶25.

[3] Garrity, 77 Wis. 2d at 542.

1

not recover payments from the tortfeasor or the tortfeasor's insurer until the insured has been compensated for all elements of damages he or she sustained.

¶60 The limitations on subrogation imposed by the made whole doctrine exist to prevent the inequitable prospect of an insurance company competing with its insured for funds when the insured has indisputably not been made whole.[4] The court has explained: "Where either the [insurance company] or the insured must to some extent go unpaid, the loss should be borne by the [insurance company] for that is a risk the insured has paid it to assume."[5]

¶61 Numerous cases focus on the interplay of subrogation and the made whole doctrine in a variety of fact situations. Because the essence of the case law is that equitable principles apply to subrogation and the made whole doctrine,[6] these cases turn on their specific facts.

---

[4] Schulte v. Franzin, 176 Wis. 2d 622, 625, 500 N.W.2d 305 (1993).

See Petta v. ABC Ins. Co., 2005 WI 18, ¶38, 278 Wis. 2d 251, 692 N.W.2d 639 ("Outside of situations where a person has a competing claim with a subrogated insurer, the equities will vary dramatically.").

[5] Rimes v. State Farm Mut. Auto. Ins. Co., 106 Wis. 2d 263, 276, 316 N.W.2d 348 (1982) (quoting Garrity, 77 Wis. 2d at 542).

[6] Fischer v. Steffen, 2011 WI 34, ¶34, 333 Wis. 2d 503, 797 N.W.2d 501.

2

¶62 Although the case law is not easy to follow, certain principles are very clear: Subrogation and the made whole doctrine are equitable doctrines. There is no subrogation until an insured is made whole. Subrogated insurance companies should not compete with their insureds for limited settlement funds.

¶63 The undisputed facts here are that Dufour recovered from the tortfeasor's insurance company, American Standard, and his insurance company, Dairyland, a total of $200,000 for bodily injuries stemming from a motorcycle accident. This sum did not cover Dufour's full losses for bodily injuries.

¶64 In addition, Dairyland paid Dufour the sum of $15,589.86, to compensate for damages to Dufour's motorcycle.

¶65 Based on this payment for damages to the motorcycle, Dairyland sought reimbursement for the $15,589.86 from American Standard. Under American Standard's policy insuring the tortfeasor, American Standard was liable to the injured person for property damage caused by American Standard's insured (the tortfeasor).

¶66 After Dairyland was reimbursed $15,589.86 by American Standard, Dufour sought this $15,589.86 from Dairyland on the grounds that he was not made whole.[7]

¶67 The issue in the instant case is who is entitled to this $15,589.86——Dufour, or Dairyland, his insurance company—— given that Dufour has not been fully compensated for his bodily injuries from the accident.

¶68 Contrary to the majority opinion's assertions, in the instant case, the insured and his insurance company are competing for a limited pool of funds that is not sufficient to satisfy both the insured's losses and the insurance company's subrogation interest. An overriding concern of the made whole doctrine is the "inequitable prospect of insurance companies attempting to take the funds that should have gone to the insured."[8] The majority opinion ignores this competition for the

---

[7] An article refers to the three parties involved in subrogation and the made whole doctrine as follows: The tortfeasor is referred to as the "loss-causer"; the injured party is referred to as the "loss-victim"; and the loss-victim's insurance company is referred to as the "loss-insurer." See Brendan S. Maher & Radha A. Pathak, Understanding and Problematizing Contractual Tort Subrogation, 40 Loy. U. Chi. L.J. 49, 50 (2008). Although I do not use this terminology, I find it descriptive and helpful.

[8] Vogt v. Schroeder, 129 Wis. 2d 3, 14, 383 N.W.2d 876 (1986).

4

funds, but "[t]he practical competition between an insured and the subrogated insurer is an equitable factor we cannot ignore."[9]

¶69 I dissent in part because I would affirm that part of the decision of the court of appeals holding that the made whole doctrine applies in the instant case and that Dairyland is barred from retaining the $15,589.86. This result is just and equitable under the circumstances.

¶70 Although "Wisconsin decisional law has done more to influence the expansion of the made whole doctrine than that of any other jurisdiction,"[10] recent Wisconsin cases are chipping away at the doctrine. The majority opinion in the instant case continues this process of chipping away and in so doing, fails to clarify the already messy interplay between subrogation and

---

[9] Schulte, 176 Wis. 2d at 633.

[10] Johnny C. Parker, The Made Whole Doctrine: Unraveling the Enigma Wrapped in the Mystery of Insurance Subrogation, 70 Mo. L. Rev. 723, 771 (2005).

5

the made whole doctrine in Wisconsin.[11]  I disagree with chipping away at the made whole doctrine.

¶71  I concur in part, however, because I agree with the majority opinion's conclusion that Dairyland did not act in bad faith when it denied Dufour's claim.  I do not agree with the majority's discussion of this issue.  I conclude that Dairyland had a reasonable basis "to conclude that [its insured's] claim

---

[11] See Donald H. Piper & Terry J. Booth, Subrogation, in 3 The Law of Damages in Wisconsin § 32.22 (Russell Ware ed., 6th ed. 2016) (stating that the scope of the made whole doctrine "is not currently well defined" in Wisconsin); John J. Kircher, Insurer Subrogation in Wisconsin: The Good Hands (Or a Neighbor) In Another's Shoes, 71 Marq. L. Rev. 33, 72 (1987) (noting that although "[m]uch water has passed over, under, around and through the judicial dam since the supreme court articulated the first principle affecting insurer subrogation in Wisconsin," "[c]larity has not always been the product of the courts' decisions."); see also Jeffrey A. Greenblatt, Comment, Insurance and Subrogation: When the Pie Isn't Big Enough, Who Eats Last?, 64 U. Chi. L. Rev. 1337, 1345, 1360 (1997) (discussing the "messy difficulties of applying the made-whole doctrine," and suggesting that "[e]ven defining the term 'made whole' is difficult.").

For discussions of subrogation and the made whole doctrine, see, e.g., 4 New Appleman Law of Liability Insurance ch. 42 (Matthew Bender rev. ed., 2d ed. 2015); 16 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d, chs. 222-226 (2005); II Arnold P. Anderson, Wisconsin Insurance Law ch. 10 (7th ed. 2015); 3 The Law of Damages in Wisconsin, ch. 32 (Russell Ware ed., 6th ed. 2016); Maher & Pathak, supra note 7; Parker, supra note 7; Greenblatt, supra, at 1345, 1360; Kircher, supra, at 72; Matthiesen, Wickert & Lehrer, S.C., Made Whole Doctrine in All 50 States, https://www.mwl-law.com/wp-content/uploads/2013/03/made-whole-doctrine-in-all-50-states.pdf (last updated Feb. 5, 2016)

is fairly debatable and that therefore payment need not be made on the claim."[12]

¶72 Accordingly, I dissent in part, concur in part, and write separately.

I

¶73 I begin with the undisputed facts and the issue presented.

¶74 Dennis Dufour was seriously injured in a motorcycle accident. Dufour's bodily injuries exceeded $200,000. Dufour's property damage, namely damage to his motorcycle, amounted to $15,589.86.

¶75 Dairyland paid Dufour, its insured, $100,000, its policy limit for underinsured motorist coverage, for his bodily injuries. American Standard, the tortfeasor's insurance company, paid Dufour $100,000, its liability policy limit, for his bodily injuries.

¶76 Dairyland also paid Dufour $15,589.86 for the damage to his motorcycle.

¶77 As a result, Dufour received the full amount of his property damage from his insurance company. Dufour has not, however, received full compensation for his bodily injuries. He

---

[12] See Brown v. LIRC, 2003 WI 142, ¶24, 267 Wis. 2d 31, 671 N.W.2d 279.

has not been made whole for all bodily injuries he sustained in the motorcycle accident.

¶78 After paying Dufour its $100,000 policy limit for bodily injury and $15,589.86 for his property damage, Dairyland sought and obtained in subrogation from American Standard, the tortfeasor's insurance company, $15,589.86——the sum Dairyland paid Dufour for damage to his motorcycle. Obviously in paying Dairyland $15,589.86, American Standard agreed that its policy obligated it to pay Dufour for property damage to his motorcycle.

¶79 The central question presented in the instant case is who is entitled to the $15,589.86 obtained by Dairyland from American Standard: Dairyland or Dufour? The answer hinges on whether Dufour has been "made whole," the general rule being that "there is no subrogation until the insured has been made whole,"[13] in light of the equities of this particular fact situation.

II

¶80 I turn now to applying subrogation and the made whole doctrine in the instant case.

¶81 A premise of the made whole doctrine, as we have previously stated, is that subrogation does not ordinarily arise until the loss has been fully paid. When speaking of the loss

_____

[13] Garrity, 77 Wis. 2d at 542.

in a tort case, "the loss" refers to all damages arising from a single occurrence. Considering all damages arising from a single occurrence as "the loss" is in keeping with the rule that a cause of action in tort includes all elements of damages.[14]

¶82 In the instant case, it is undisputed that Dufour has not been made whole for "all the elements of damages" he sustained as the result of the accident. Dufour's bodily injuries exceeded the $200,000 he received.

¶83 Since our seminal cases applying the made whole doctrine, Rimes v. State Farm Automobile Insurance Co., 106 Wis. 2d 263, 275, 316 N.W.2d 348 (1982), and Garrity v. Rural Mutual Insurance Co., 77 Wis. 2d 537, 542-43, 253 N.W.2d 512 (1977), this court has made clear that the made whole doctrine bars subrogation unless "the insured has been completely compensated for all the elements of damages, not merely those damages for which the insurer has indemnified the insured."[15]

¶84 After this court decided Garrity and Rimes, the court clarified the role of the equities in applying subrogation and the made whole doctrine. The court stated in Vogt v. Schroeder, 129 Wis. 2d 3, 12, 383 N.W.2d 876 (1986), that because

---

[14] The cause of action against a tortfeasor is indivisible. Muller, 309 Wis. 2d 410 (citing Garrity, 77 Wis. 2d at 542); see also Caygill v. Ipsen, 27 Wis. 2d 578, 582-83, 135 N.W.2d 284 (1965).

[15] Rimes, 106 Wis. 2d at 275 (quoted with approval in Schulte, 176 Wis. 2d at 628).

subrogation and the made whole doctrine are equitable doctrines, and "[e]quity does not lend itself to the application of black letter rules," the made whole doctrine as set forth in Garrity and Rimes would be applied only when it leads to equitable results.[16]

¶85 Relying on this language in Vogt, the majority opinion concludes that even though Dufour has not been made whole for "all elements of damages"——namely his bodily injuries——the made whole doctrine does not apply because "the equities favor Dairyland . . . ."[17]

¶86 The majority opinion relies on three non-exhaustive equitable principles that may affect subrogation:[18] (1) ensuring that the injured person (here Dufour) is fully compensated for the loss; (2) preventing the injured person (here Dufour) from being unjustly enriched; and (3) ensuring that the tortfeasor is held responsible for his conduct and does not get off scot-free while another, here the injured person's (Dufour's) insurance

---

[16] See Muller, 309 Wis. 2d 410, ¶44 ("'Hence, only under fact situations where an equitable result will follow should the statements quoted above [e.g., 'the conventionally subrogated or contractual insurer has no share in the recovery from the tort-feasor if the total amount recovered by the insured from the insurer does not cover his loss' Garrity, 77 Wis. 2d at 544] be applied literally.'") (quoting Vogt, 129 Wis. 2d at 12) (alteration in original) (emphasis omitted).

[17] See majority op., ¶4.

[18] See majority op., ¶18 (quoting Muller, 309 Wis. 2d 410, ¶60).

company (Dairyland), is required to pay for the tortfeasor's conduct.

¶87 The majority opinion weighs the equities and permits Dairyland to retain the $15,589.86 it obtained in subrogation from American Standard, the tortfeasor's insurance company.[19]

¶88 I also weigh the equities. Applying the three equitable principles set forth by the majority opinion, I conclude that the equities favor Dufour, not Dairyland (see part A below). I also disagree with the majority's reading of the case law (see part B below).

A

¶89 The equities favor Dufour, not Dairyland.

¶90 In the instant case, Dairyland is competing with Dufour, its insured, for a limited pool of funds. Dairyland and Dufour are competing for the same $15,589.86 that the tortfeasor (through his insurance company, American Standard) was liable for under its policy as a result of the motorcycle accident.

¶91 The made whole doctrine is designed to prevent competition between the injured party and his or her insurance company when the injured party's damages exceed the limited pool of funds from which recovery may be had. The case law is clear: When a limited pool of funds is insufficient to make the injured

---

[19] See majority op., ¶56.

11

party whole, the loss should be borne by the injured party's insurance company (here, Dairyland).[20]

¶92 That the insurance company (here, Dairyland) bears the loss rather than the insured (here, Dufour) when funds are insufficient to pay the insured's entire damages is referred to as the "recovery priority rule" or the "subrogation rule of priority."[21] The recovery priority rule establishes that Dufour, the injured party, should be the first to tap into the limited pool of funds and recover any uncompensated damages under the made whole doctrine.

¶93 In acting on its subrogation rights to seek recovery from the tortfeasor, Dairyland must recognize Dufour's priority over the limited pool of available funds. Because there was an insufficient pool of funds to satisfy Dufour's entire claim, Dufour takes priority over Dairyland in the allocation of these funds; the made whole doctrine applies with full force.[22]

¶94 In sum, Dufour is entitled to recover in full any sums payable by the tortfeasor before Dufour's insurance company could exercise any right of subrogation. "Subrogation is to be allowed only when the insured is compensated in full by recovery

---

[20] See Muller, 309 Wis. 2d 410, ¶¶27-44; Rimes, 106 Wis. 2d at 275-76; Garrity, 77 Wis. 2d at 542.

[21] This principle was established by Garrity, 77 Wis. 2d at 542-43, and is repeated in Muller, 309 Wis. 2d 410, ¶¶28-32.

[22] Muller, 2008 WI 50, ¶72, 309 Wis. 2d 410, 750 N.W.2d 1.

from the tortfeasor." Rimes, 106 Wis. 2d at 272; see also Garrity, 77 Wis. 2d at 542.[23]

¶95 I conclude that Dufour, the insured who has not been made whole for his bodily injuries in a settlement with the tortfeasor for the tortfeasor's policy limits, has priority over Dairyland for the $15,589.86 paid by the tortfeasor's insurance company for Dufour's subrogated property damage claim. As a result, Dairyland should not be permitted to keep the $15,589.86.

¶96 The three equitable principles outlined in Muller v. Society Ins., 2008 WI 50, ¶60, 309 Wis. 2d 410, 750 N.W.2d 1, and set forth by the majority opinion favor Dufour in the instant case. First, Dufour was not fully compensated for his losses. Second, Dufour will not be unjustly enriched if he receives $15,869.86 from Dairyland. There is no double recovery here because Dufour has not been fully compensated for all his losses. Third, the tortfeasor (through his insurance policy) is held responsible for his conduct regardless of whether Dufour or Dairyland retains the $15,589.86. The tortfeasor has paid for

---

[23] See Paulson v. Allstate Ins. Co., 2003 WI 99, ¶27 & n.3, 263 Wis. 2d 520, 665 N.W.2d 744 (Rimes and Garrity apply when the "pie" is not big enough to completely satisfy the claims of both the injured insured and its insurance company); Drinkwater v. Am. Family Mut. Ins. Co., 2006 WI 56, ¶¶16-23, 290 Wis. 2d 642, 714 N.W.2d 568 ("Subrogation under circumstances where the insured had not been made whole 'turn[s] the entire doctrine of subrogation in its head.'") (citing Ruckel v. Gassner, 2002 WI 67, ¶41, 253 Wis. 2d 280, 646 N.W.2d 11).

13

the property damage he caused, and the tortfeasor's insurance company is not permitted to retain the funds it owes for Dufour's property damage.

¶97 In sum, this case is not a dispute between the tortfeasor and the injured party. The dispute is between Dufour and Dairyland, his insurance company; Dufour and Dairyland are competing for the funds the tortfeasor owes and has paid under his policy.

B

¶98 Furthermore, the majority's conclusion favoring Dairyland over Dufour is based on a mistaken reading of Valley Forge Insurance Co. v. Home Mutual Insurance Co., 133 Wis. 2d 364, 396 N.W.2d 348 (Ct. App. 1986).[24]

¶99 In Valley Forge, the court of appeals concluded that the equities favored the insured in a fact situation almost identical to that in the instant case.

---

[24] The majority opinion uses sentences from cases taken out of context and, in my view, misreads several cases. I do not point out each problem in the majority opinion. See, for example, the majority opinion's discussion (at ¶¶32-33) of Mutual Service Casualty Co. v. American Family Insurance Group, 140 Wis. 2d 555, 561, 410 N.W.2d 582 (1987). Mutual Service was narrowed by Schulte, 176 Wis. 2d at 635-36. Indeed, Justice Steinmetz's dissent in Schulte objected to the decision on the grounds that it "improperly violate[d] the doctrine of stare decisis by rejecting the result and some of the reasoning in . . . Mutual Service . . . .").

14

¶100 The plaintiff in Valley Forge was injured in a car accident.[25] The plaintiff's insurance company, Valley Forge, paid the plaintiff $6,000 for damage to his vehicle.[26]

¶101 The plaintiff then entered into a settlement agreement with Home Mutual Insurance Company (the tortfeasor's insurance company), whereby the plaintiff was paid $25,000 for his bodily injuries and $6,000 for property damage to his vehicle.[27] The plaintiff agreed to indemnify Home Mutual against any liability Home Mutual incurred as a result of the settlement.[28] The plaintiff's bodily injuries exceeded the sum that he was paid.[29]

¶102 The plaintiff's insurance company, Valley Forge, asserted subrogation rights to (and requested payment of) the $6,000 from Home Mutual (the tortfeasor's insurance company) to avoid the possibility of a double recovery by the plaintiff.[30]

¶103 The Valley Forge court noted that although it appeared that the plaintiff was receiving a double recovery for his property damage, there was no double recovery because the

---

[25] Valley Forge Ins. Co. v. Home Mut. Ins. Co., 133 Wis. 2d 364, 366, 396 N.W.2d 348 (Ct. App. 1986).

[26] Valley Forge, 133 Wis. 2d at 366.

[27] Valley Forge, 133 Wis. 2d at 366.

[28] Valley Forge, 133 Wis. 2d at 367.

[29] Valley Forge, 133 Wis. 2d at 367.

[30] Valley Forge, 133 Wis. 2d at 366.

15

plaintiff was not made whole for "'all the elements of damages . . . .'"[31] According to Valley Forge, being made whole depends on the insured being completely compensated for all types of damages, including bodily injuries and property damage.[32]

¶104 Because the plaintiff had not been made whole for "'all the elements of damages . . . ,'" his recovery of available subrogated property damage funds was not an impermissible double recovery.[33]

¶105 Valley Forge follows long-settled Wisconsin law that, as a general rule, the subrogor (that is, the injured insured) must be made whole before the subrogee (that is, the injured insured's insurance company) may recover anything from the tortfeasor.[34]

¶106 Relying on Vogt's pronouncement that subrogation is an equitable doctrine that "'depends upon a just resolution of a dispute under a particular set of facts,'" the court of appeals held that Valley Forge was not entitled to subrogation because

---

[31] Valley Forge, 133 Wis. 2d at 368 (quoting Rimes, 106 Wis. 2d at 275).

[32] See Valley Forge, 133 Wis. 2d at 368-69.

[33] Valley Forge, 133 Wis. 2d at 368 (quoting Rimes, 106 Wis. 2d at 275).

[34] Garrity, 77 Wis. 2d at 541; Rimes, 106 Wis. 2d at 272-73.

the tortfeasor and Valley Forge together paid the plaintiff less than the total loss the plaintiff suffered.[35]

¶107 Valley Forge concluded, as had previous cases, that where either the insurance company or the injured insured has to suffer a loss, the loss should fall on the insurance company.[36]

¶108 The majority opinion expresses "serious concerns about the court of appeals decision in Valley Forge and caution[s] against its use . . . ."[37] Nevertheless, the majority opinion declines to overrule Valley Forge. Instead it distinguishes Valley Forge based on an overly narrow reading of the facts and longstanding case law.[38]

¶109 I am not persuaded by the majority opinion's reading of Valley Forge. As the court of appeals recognized in the instant case, "the facts before us here, for all relevant purposes, are identical to those in Valley Forge . . . ."[39]

¶110 In both Valley Forge and in the instant case the issue is the same: Do funds obtained from the tortfeasor's insurance company belong to the injured insured or to the insured's

---

[35] Valley Forge, 133 Wis. 2d at 369 (quoting Vogt, 129 Wis. 2d at 12).

[36] See Valley Forge, 133 Wis. 2d at 368.

[37] Majority op., ¶52.

[38] Majority op., ¶52.

[39] Dufour v. Progressive Classic Ins. Co., No. 2014AP157, unpublished slip op., ¶26 (Wis. Ct. App. July 16, 2015).

insurance company when the insured has not been made whole for all the elements of damages suffered?  At its core, the question in both Valley Forge and the instant case is who ought to receive funds that are paid on behalf of the tortfeasor:  the injured person who has not been fully compensated for all his losses, or his insurance company?

¶111 Valley Forge is applicable to the instant case because it addresses who is entitled to the limited pool of funds by applying the equitable subrogation and made whole doctrines.

¶112 Paulson v. Allstate Insurance Co., 2003 WI 99, ¶25, 263 Wis. 2d 520, 665 N.W.2d 744, confirmed that Valley Forge was an example of impermissible competition between the insurer and insured for a limited pool of funds:  "In Valley Forge . . . the court of appeals held that a victim's insurer was not entitled to subrogation where the victim recovered less than his total loss.  Again, the situation was one of the insurer competing with the insured for funds."

¶113 In Valley Forge, the insured was in possession of the funds furnished by the tortfeasor's insurance company for property damage; in the instant case, Dairyland is in possession of the funds furnished by the tortfeasor's insurance company for property damage.

¶114 The Valley Forge decision is not contingent on who possesses the limited pool of funds, but rather who is entitled to the funds.

¶115 As in Valley Forge, the insured and the insurance company in the instant case are fighting over a limited pool of money owed and supplied by the tortfeasor's insurance company. By relying on the factual difference in the two cases regarding possession of the pool of funds, the majority opinion elevates form over substance.

¶116 The majority opinion attempts to distinguish Valley Forge by maintaining that, unlike the plaintiff in Valley Forge, Dufour had no access to any additional funds from either insurance company "but for Dairyland's subrogation action against the tortfeasor's insurer . . . . Consequently, allowing Dairyland to seek and obtain subrogation had no effect on Dufour's recovery."[40] But Dairyland did assert its subrogation rights, American Standard paid the sum its insured (the tortfeasor) owed Dufour, and the issue is who is entitled to these funds.

¶117 The majority does not explain how, if Dufour had no right to seek funds for property damage from the tortfeasor's insurance company, Dairyland could seek such funds from the tortfeasor's insurance company. After all, "subrogation confers no greater rights on the subrogee [Dairyland] than the subrogor [Dufour] had at the time of the subrogation . . . . Thus, where one acquires a right by subrogation, that right is not a

---

[40] Majority op., ¶50.

19

separate cause of action from the right held by the subrogor . . . . '[I]t is better to think of the insurer as an assignee of part of the claim.'"[41]

¶118 In the instant case, Dufour's acceptance of payment for property damage from Dairyland does not operate as an assignment to Dairyland of Dufour's claim for property damage against the tortfeasor. When the injured party has not been made whole, the made whole doctrine trumps any assignment based on the doctrine of subrogation.[42] We stated this principle in Muller v. Society Insurance, 2008 WI 50, ¶29, 309 Wis. 2d 410, 750 N.W.2d 1, as follows (citation and internal quotation marks omitted):

> The cause of action against the tortfeasor is viewed as an indivisible claim, and the plaintiff [here, Dufour] holds this claim until he is given the opportunity to fully recover his loss. Logically, this principle establishes the insured's priority over his insurer [here, Dairyland] in pursuing recovery,

---

[41] Wilmot v. Racine Cnty., 136 Wis. 2d 57, 63-64, 400 N.W.2d 917 (1987) (citation omitted) (quoting Heifetz v. Johnson, 61 Wis. 2d 111, 120, 211 N.W.2d 834 (1973)); see also Ruckel v. Gassner, 2002 WI 67, ¶27, 253 Wis. 2d 280, 646 N.W.2d 11 ("[U]nder basic principles of subrogation . . . , the insurer is not entitled to recoup anything until the insured has been made whole.") (citing Garrity, 77 Wis. 2d at 543-44).

[42] Schulte, 176 Wis. 2d at 637.

and the general rule [is] that there is no subrogation until the insured has been made whole.[43]

¶119 Dairyland asserts that allowing Dufour to retain the $15,589.86 amounts to rewriting the insurance policy to provide for a combined single coverage limit to make up for inadequate bodily injury coverage. This argument has superficial appeal but on analysis is not convincing.

¶120 The insured's policy is not being rewritten. No combined single limit is imposed on Dairyland. Nothing about the instant case requires that insurance funds covering one type of loss (e.g., property damage) be paid for another type of loss (e.g., personal injury). Rather, the instant case involves subrogation and the made whole doctrine and the application of equitable principles.

¶121 The majority opinion suggests that "the made whole doctrine . . . is inapplicable if the claim is 'brought by a subrogated insurer against the tortfeasor or the tortfeasor's

---

[43] In Muller, the tortfeasor's insurance liability was sufficient to cover all the property losses sustained by the insured and the insured's insurance carrier. Muller, 309 Wis. 2d 410, ¶4. The court therefore held that the made whole doctrine did not apply even though the insured settled for less than full losses. Muller, 309 Wis. 2d 410, ¶4.

The Muller court, however, preserved the rule that when the funds are limited, the insured is entitled to be made whole. See Muller, 309 Wis. 2d 410, ¶72.

Subrogation is not permitted in the instant case because unlike in Muller, the injured party, Dufour, exhausted all of the available insurance limits without being made whole.

insurer where the subrogated insurer's insured has previously settled with the tortfeasor.'"[44]

¶122 This suggestion was repudiated in <u>Schulte v. Franzin</u>, 176 Wis. 2d 622, 635-36, 500 N.W.2d 305 (1993).

¶123 <u>Schulte</u> concluded that when an injured insured settles with the tortfeasor and the tortfeasor's insurance company without resolving the subrogated insurance company's part of the claim, the subrogated insurance company's rights of subrogation depend on whether the settlement made the insured whole.[45] If the settlement does not make the insured whole, the subrogated insurance company has no right of subrogation.[46]

¶124 I agree with the simple, clear implication of <u>Rimes</u>, <u>Garrity</u>, <u>Vogt</u>, and <u>Valley Forge</u>: "[W]here either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume."[47]

¶125 In sum, the well-accepted principles, including equitable principles, relating to subrogation and the made whole

---

[44] Majority op., ¶32 (quoting <u>Mut. Serv. Cas. Co. v. Am. Family Ins. Grp.</u>, 140 Wis. 2d 555, 563-64, 410 N.W.2d 582 (1987).

[45] <u>Schulte</u>, 176 Wis. 2d at 637.

[46] <u>Schulte</u>, 176 Wis. 2d at 637.

[47] <u>Garrity</u>, 77 Wis. 2d at 542.

doctrine weigh in favor of Dufour, not Dairyland. A ruling in Dufour's favor:

- Protects and defends the right of the insured injured person to be made whole;

- Preserves the limitations on subrogation imposed by the made whole doctrine by not allowing subrogation for "discrete" coverages;

- Reaffirms the equitable principle that if someone must suffer a loss, it should be the insurance company, not the injured insured;

- Avoids a double recovery or windfall because the insured has not been made whole for the full extent of his or her losses; and

- Ensures that an insurance company does not inequitably compete with its insured for a limited pool of funds insufficient to make the insured whole for the losses caused by the tortfeasor.

¶126 Unfortunately, the majority opinion shifts away from the compensatory purpose of the made whole doctrine and instead protects the financial interests of the insurance company to the detriment of its insured who paid the premiums.

¶127 Valley Forge is not distinguishable on its facts, is consistent with longstanding case law, does not rewrite Dairyland's policy, and correctly rules on equitable principles.

23

Accordingly, I would follow <u>Valley Forge</u>, as did the court of appeals.

III

¶128 I concur in part because I agree with the majority opinion's conclusion that Dairyland, Dufour's insurance company, did not act in bad faith when it denied Dufour's claim. Dairyland had a reasonable basis "to conclude that [its insured's] claim is fairly debatable and that therefore payment need not be made on the claim."[48] The "fairly debatable" standard is an objective test that asks whether a reasonable insurance company under similar circumstances would have denied payment on the claim.[49] I conclude that Dairyland has met this objective test by putting forward non-frivolous arguments in favor of its view that Dufour's claim was fairly debatable.

¶129 For the reasons set forth, I dissent in part, concur in part, and write separately.

¶130 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[48] See <u>Brown</u>, 267 Wis. 2d 31, ¶24.

[49] See <u>Brown</u>, 267 Wis. 2d 31, ¶24.

24